# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CENTRAL LABORERS' PENSION FUND, EZRA CATTAN, LISA CATTAN, SAUL CATTAN, SEAN ENDRESS, MIKHAIL KUPERMAN, HASSAN KUTOM, KRISTOPHER MARES, and TAYLOR MCGRAW, Derivatively on Behalf of PALANTIR TECHNOLOGIES INC.,

            Plaintiffs,

            v.

ALEXANDER C. KARP, PETER THIEL, STEPHEN COHEN, ALEXANDER MOORE, RYAN TAYLOR, SPENCER RASCOFF, ALEXANDRA SCHIFF, LAUREN FRIEDMAN STAT, SHYAM SANKAR, DAVID GLAZER, and KEVIN KAWASAKI,

            Defendants,

       and

PALANTIR TECHNOLOGIES INC., a Delaware Corporation,

            Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2023-0864-LWW

## MEMORANDUM OPINION

Date Submitted: January 15, 2025
Date Decided: April 25, 2025

Christine M. Mackintosh, Rebecca A. Musarra & Edward M. Lilly, GRANT & EISENHOFER P.A., Wilmington, Delaware; David T. Wissbroecker, GRANT & EISENHOFER P.A., San Francisco, California; Joseph H. Weiss, David C. Katz & Mark D. Smilow, WEISS LAW, New York, New York; Brian J. Robbins, Stephen J. Oddo & Eric M. Carrino, ROBBINS LLP, San Diego, California; Leonid Kandinov, MORRIS KANDINOV LLP, San Diego, California; Peretz Bronstein & Eitan Kimelman, BRONSTEIN, GEWIRTZ & GROSSMAN, LLC, New York, New York; *Counsel for Plaintiffs*

Peter J. Walsh, Jr., T. Brad Davey, Jonathan A. Choa & Eric J. Nascone, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Boris Feldman, FRESHFIELDS BRUCKHAUS DERINGER US LLP, Redwood City, California; David Livshiz, Maria Slobodchikova & Susannah Benjamin, FRESHFIELDS BRUCKHAUS DERINGER US LLP, New York, New York; *Counsel for Defendants Palantir Technologies Inc., Alexander C. Karp, Peter Thiel, Stephen Cohen, Alexander Moore, Ryan Taylor, Spencer Rascoff, Alexandra Schiff, Lauren Friedman Stat, Shyam Sankar, David Glazer, and Kevin Kawasaki*

**WILL, Vice Chancellor**

In September 2020, Palantir, Inc. went public through a direct listing. Palantir's officers and directors sold shares into the public market. They made billions of dollars in total.

Several stockholders of Palantir now claim that those sales, and others made months later, amount to insider trading. The plaintiffs posit that the defendants orchestrated the direct listing to offload shares before business setbacks were disclosed. They also assert that, after the offering, Palantir announced an investment scheme in special purpose acquisition companies (SPACs) to prop up its stock price and facilitate additional insider trades.

The plaintiffs' story unwinds upon closer inspection.

Contrary to the plaintiffs' criticisms, there is nothing inherently suspect about a company's pursuit of a direct listing. The point is for existing stockholders to sell their shares to achieve liquidity, rather than to raise new capital. The structure requires sales of existing stock to create a public market since no new shares are issued. Sales are made directly to the public, and prices are market-driven based on supply and demand.

For Palantir, the direct listing marked the first time its investors had access to liquidity. Many of the challenged sales were made under 10b5-1 plans or to cover tax obligations, meaning that the insiders lacked discretion over them. The information that purportedly motivated the trades was public, immaterial, or belied

1

by the very documents on which the plaintiffs rely. Notably, the defendants kept about 75% of their Palantir stock.

The plaintiffs advance no well-pleaded facts from which I can reasonably infer impropriety. Though some directors made substantial profits by selling stock, that alone is insufficient to impugn them. Delaware law sets the bar to insider trading liability high to avoid restricting legitimate market activity. Insiders are not penalized for making investment decisions based on public information—even if their trades are lucrative.

Because the plaintiffs have failed to satisfy the stringent Rule 23.1 standard, this case is dismissed.

## I.    FACTUAL BACKGROUND

The following background is drawn from the plaintiffs' Amended Verified Stockholder Derivative Complaint (the "Complaint"), documents it incorporates by reference, and facts subject to judicial notice.[1]

---

[1] Verified Am. S'holder Deriv. Compl. ("Compl.") (Dkt. 25); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . ."), *aff'd*, 58 A.3d 414 (Del. 2013); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC.").

## A. Palantir's Direct Listing

In 2003, Alexander Karp, Steven Cohen, and Peter Thiel co-founded Palantir Technologies Inc.—a Delaware corporation with its principal executive offices in Colorado.[2] Palantir builds and deploys software platforms for big data analytics.[3] It initially focused on serving the government sector. Today, it provides software and services to both government and commercial customers.[4]

Palantir was a private company for 17 years. On September 30, 2020, it went public through a direct listing.[5]

In a traditional initial public offering, a company issues new shares under a registration statement with an underwriter setting the initial sale price and acting as

---

Citations to "Defs.' Opening Br. Ex. __" refer to exhibits to the Transmittal Affidavit of T. Brad Davey in Support of Individual Defendants' and Nominal Defendant's Opening Brief in Support of Their Motion to Dismiss or Stay Plaintiffs' Verified Amended Stockholder Derivative Complaint. Dkts. 38-41. These exhibits include documents produced to the plaintiffs under 8 *Del. C.* § 220, which are deemed incorporated by reference into the Complaint by agreement of the parties. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016). Pincites to certain exhibits are the last several characters of Bates stamps. Citations to "Defs.' App. __" refer to appendices to the defendant's opening brief, which summarize information from Palantir public filings. Dkt. 37.

[2] Compl. ¶¶ 25, 57.

[3] Palantir Techs. Inc., Am. No. 6 to Registration Statement on Form S-1/A (filed Sept. 21, 2020), https://www.sec.gov/Archives/edgar/data/1321655/000119312520249544/d904406ds1a.htm ("Registration Statement") 1, 6; *see also* Defs.' Opening Br. Ex. 58 (Excerpt, Registration Statement).

[4] Compl. ¶¶ 2, 57.

[5] *Id.* ¶¶ 60, 62.

an intermediary. In a direct listing, by contrast, a company does not issue new shares but offers preexisting shares for sale on a public stock exchange.[6] Because no underwriter is involved, the significant transaction costs of an IPO are reduced. Current stockholders—founders, equity-compensated employees, and early investors—are free to sell their shares to the public.[7] Trading prices and volumes are dictated by the supply of shares those current stockholders are willing to sell and the demand from public investors.

A direct listing can promote a company's goal of "affording [its] shareholders (whether investors, employees, or others) the convenience of being able to sell their existing shares on a public exchange."[8] In Palantir's case, the direct listing provided

---

[6] *See* Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing of Amendment No. 3 and Order Granting Accelerated Approval of Proposed Rule Change, as Modified by Amendment No. 3, to Amend Section 102.01B of the NYSE Listed Company Manual to Provide for the Listing of Companies that List without a Prior Exchange Act Registration and that are Not Listing in Connection with an Underwritten Initial Public Offering and Related Changes to Rules 15, 104, and 123D Exchange Act Release No. 34-82627, 83 Fed. Reg. 5650 (Feb. 2, 2018), https://www.sec.gov/rules/sro/nyse/2018/34-82627.pdf. Both registered and still unregistered shares can be sold to the public.

[7] *See Section 11 Liability and Direct Listing of Securities*, 24 Sec. Pub. & Priv. Offerings § 12:5:20 (2d ed.), Westlaw (updated Nov. 2024); *see also* Maria Lucia Passador, *Finding an alternative to IPOs: direct listings and SPACs*, RESEARCH HANDBOOK ON GLOBAL CAPITAL MARKETS LAW 99 (Iris H.-Y Chiu & Iain G. MacNeil eds., 2023) (explaining that though direct listings have been relatively rare, they may be beneficial for "well-capitalized companies that do not need to raise additional capital, but [have] a large and diverse shareholder base that can provide sufficient liquidity from day one of trading").

[8] *See Slack Techs., LLC v. Pirani*, 598 U.S. 759, 763-64 (2023) (describing the direct listing process and observing that liquidity access rather than capital raising is a motivating factor for some firms that seek to become public).

immediate liquidity to its current stockholders for the first time in 17 years.[9] Its cofounders and other Palantir officers and directors—the defendants in this suit—sold a total of 47.8 Palantir shares for approximately $475 million within three days of the offering.[10]

Although direct listings often lack the lock-up agreements typical of IPOs, Palantir limited the defendants' sales in two ways. Vesting schedules to the defendants' stock awards and options prevented them from selling all restricted stock units and options.[11] And Palantir voluntarily imposed a partial lockup that prevented insiders from selling more than 20% of their shares before February 18, 2021.[12]

## B. The Registration Statement

Nine days before the direct listing, on September 21, Palantir filed its Registration Statement with the Securities and Exchange Commission.[13] The Registration Statement disclosed Palantir's "accelerated" growth in 2020.[14] It

---

[9] Compl. ¶¶ 62, 65.

[10] *Id.* ¶¶ 76-77.

[11] Registration Statement 72, 125, 184-90 (describing executive compensation arrangements).

[12] Compl. ¶ 8 & n.2.

[13] *Id.* ¶ 72.

[14] Registration Statement 93.

5

explained that in the first half of fiscal 2020, Palantir had generated $481.2 million in revenue, reflecting a 49% growth rate compared to the first half of fiscal 2019.[15]

Palantir's comparisons of its 2019 and 2020 revenues were broken down by two main business segments: government and commercial.[16] The COVID-19 pandemic gave Palantir's government segment a substantial boost.[17] The Registration Statement observed that recent growth in the government sector might be unsustainable because "failure to receive and maintain government contracts or changes in the contracting or fiscal policies of the fiscal sector could have a material adverse effect on [Palantir's] business."[18] On the commercial side, it acknowledged that sales efforts "involve considerable time and expense and [Palantir's] sales cycle is often long and unpredictable."[19]

More generally, the Registration Statement warned prospective investors about the uncertainty of future growth. It noted that the company had "incurred losses each year since [its] inception" and "may never achieve or maintain profitability."[20] It provided "no assurances" of continued revenue growth and

---

[15] *Id.*

[16] *Id.* at 109.

[17] Compl. ¶ 61.

[18] Registration Statement 34.

[19] *Id.* at 18.

[20] *Id.*

cautioned against "rely[ing] on the revenue of any prior quarterly or annual period as an indication of [Palantir's] future performance."[21] It identified risks that could cause a decline in revenue growth, including "increased competition, slowing demand for [Palantir's] platforms from existing and new customers, a failure . . . to continue capitalizing on growth opportunities, terminations of existing contracts by [Palantir's] customers, and the maturation of [the] business."[22] And it acknowledged the upsides and "negative headwinds" generated by the COVID-19 pandemic.[23]

## C. The 10b5-1 Plans

Shortly after the direct listing, between October and December 2020, several of the defendants entered into 10b5-1 trading plans.[24] These plans allowed the insiders to sell predetermined amounts of stock on predetermined dates.[25] If sales were made under a plan consistent with SEC Rule 10b5-1 and related guidance, the seller could have an affirmative defense against any insider trading claim.[26]

---

[21] *Id.*

[22] *Id.*

[23] Registration Statement 39.

[24] Compl. ¶ 86; *see* Defs.' Opening Br. Exs. 6-12 (10b5-1 plans).

[25] *See generally*, "Demystifying 10b5-1 Plans," Morgan Stanley At Work, https://www.morganstanley.com/atwork/employees/learning-center/articles/demystifying-10b5-1-plans (last visited Apr. 5, 2025) ("10b5-1 plans allow corporate executives and other insiders to establish preset trading plans for transacting in company stock holdings.").

[26] *See* Sec. and Exch. Comm'n, *Fact Sheet: Rule 10b5-1: Insider Trading Arrangements and Related Disclosure*, https://www.sec.gov/33-11138-fact-sheet.pdf.

Palantir insiders sold their stock for over $2 billion during the nearly two-year period after the public offering.[27] Seventy-five percent of these trades (by total proceeds) were made under 10b5-1 plans or automatically to cover tax withholding obligations.[28] The majority of the remaining sales occurred shortly after the direct listing.[29]

### D. Palantir's 2020 and Early 2021 Performance

On November 9—almost six weeks after the direct listing—management provided a business update to the Audit Committee of Palantir's Board of Directors.[30] Palantir's auditor, Ernst & Young LLP ("EY"), told the Audit Committee that "[r]evenue growth continue[d] to primarily be driven by existing customers" and that "incremental growth [was] related to COVID-19-related developments."[31] Palantir subsequently issued a Form 8-K representing that "growth and momentum across [Palantir's] business ha[d] continued," and

---

[27] Compl. Ex. A.

[28] *See* Defs.' Opening Br. Exs. 49-56 (Forms 3 and 4); *see also* Defs.' Opening Br. App. A (summarizing sales based upon disclosures in Forms 3 and 4).

[29] *See* Defs.' Opening Br. App. A (representing that defendants sold a total of $1,639,876,650 in shares subject to 10b5-1 plans or tax withholding, out of $2,184,562,002 total).

[30] Compl. ¶ 81.

[31] *Id.* ¶ 82.

8

announced in an investor call that it had "strong and increased visibility into future revenue across [its] customer base."[32]

Two months later, the Board met to consider Palantir's 2021 projected revenue. Management updated the Board on "visible" revenue Palantir had secured and expected from existing contracts.[33] A written presentation explained that "[h]istorically ~80-85% of revenue [was] visible in January of that year," with the remaining 15 to 20% generated throughout the rest of the year.[34] Based on the $1.28 billion in already-recorded revenue, management estimated that Palantir would need to generate another $220 million to reach its 2021 revenue target.[35] This additional revenue was called the "gap-to-goal."[36]

As Palantir booked additional revenue throughout the year, the gap-to-goal narrowed. Later Board presentations reported that the gap-to-goal amount shrunk to $138 million as of April 2021 and to $33 million as of July 2021.[37] Palantir closed the gap by October 2021.[38]

---

[32] *Id.* ¶¶ 83-84.

[33] Defs.' Opening Br. Ex. 1 ("Jan. 2021 Board Presentation") '734-RE.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] Defs.' Opening Br. Ex. 2 ("Apr. 2021 Board Presentation") '865-RE; Defs.' Opening Br. Ex. 4 ("July 2021 Board Presentation") '996-RE.

[38] Defs.' Opening Br. Ex. 5 ("Oct. 2021 Board Presentation") '1082-RE.

In February 2021, EY reported to the Audit Committee that "incremental growth" continued to come from "government and COVID-19 related deployments" and that Palantir was signing "[f]ewer contracts with up-front payments."[39] Five days later, Palantir provided guidance for 2021. Investors were told that Palantir expected 45% year-over-year revenue growth for the first quarter of 2021.[40]

Palantir's partial lockup expired on February 18. Several of the defendants went on to sell millions of dollars in Palantir shares.[41]

### E.    Palantir's SPAC Investments

In the months after its direct listing, Palantir's government revenue growth slowed. It declined from 68% in the third quarter of 2020 to 34% in the third quarter of 2021.[42] By the first quarter of 2022, government sector revenue growth had fallen to 16%.[43]

---

[39] Compl. ¶ 89.

[40] *Id.* ¶ 90 (quoting Feb. 16, 2021 earnings call).

[41] *Id.* ¶ 92 ("Thiel immediately dumped 20 million shares at an average price of $24.49 per share, securing $504.8 million; Cohen sold 2 million shares between February 18-22, 2021, reaping $53.6 million; Sankar sold almost 1 million shares between February 19-23, 2021, pocketing $27.4 million; and Glazer sold over 100,000 shares on February 23, 2021, reaping approximately $2.8 million.").

[42] *Id.* ¶ 93.

[43] *Id.*

Palantir turned its focus to raising commercial sector revenue.[44]  It began to invest in special purpose acquisition companies (SPACs), which were booming at the time.[45]

Under Palantir's SPAC investment strategy—dubbed a "strategic investments program"—Palantir planned to make passive, minority investments (all smaller than $50 million) in a diversified portfolio of early-stage SPACs.[46]  In exchange for these investments, the SPACs would license Palantir's software under multi-year, multi-billion-dollar licensing agreements.[47]

The Board approved Palantir's first SPAC investment of $21 million on March 3, 2021.[48]  Palantir had $2.3 billion of cash and cash equivalents on hand at the time.[49]  Palantir invested a total of $505.7 million in 27 SPACs and entered into licensing agreements worth a projected $767.9 million over the next eight months.[50]

---

[44] *Id.* ¶ 94.

[45] *Id.* ¶ 348; *cf.* Michael Klausner, Michael Ohlrogge & Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. Reg. 228, 230-31 & 231 fig.1 (2022) (reporting that in January 2020 through November 2021, SPAC IPOs accounted for more than half of total IPOs).  Palantir made its investments alongside companies including BlackRock, Inc., Pacific Investment Management Company LLC (PIMCO), and Microsoft Corporation.  *See* Ex. 83 (Lilium press release) 2, 4-5; Ex. 84 (Sarcos press release) 3.

[46] Compl. ¶ 348.

[47] *See id.* ¶¶ 93-102.

[48] *Id.* ¶ 103 (citing Board unanimous written consent).

[49] Defs.' Ex. 66 ("Q1 2021 Form 10-Q") 34.

[50] Compl. ¶¶ 102, 348.

## F. Disclosures About the SPAC Investments

Palantir disclosed the details of its strategic investment program to investors shortly after it began. In its first and second quarterly reports for 2021, Palantir listed the dates and names (or descriptions) of the investments, the number of shares acquired, the total investment price, details of any accompanying commercial agreements entered, the maximum potential revenue from the agreements, and the revenue recognized.[51] Its 2021 Form 10-K further disclosed that the SPAC commercial contracts had a "total value of . . . $767.9 million . . . inclusive of $116.2 million of contractual options" over the lifespan of the agreements (three to ten years).[52]

Palantir's 2021 Form 10-K also reported $48.3 million in total recognized revenue from SPAC commercial contracts in fiscal 2021.[53] Because the revenue was recognized ratably, it made up less than 10% of Palantir's $1.5 billion 2021 total revenue.[54]

---

[51] Q1 2021 Form 10-Q at 20, 58-59; Defs.' Ex. 67 ("Q2 2021 Form 10-Q") 15.

[52] Defs.' Opening Br. Ex. 75 ("2021 Form 10-K") 120.

[53] 2021 Form 10-K at 120 (explaining that the revenue was assessed in accordance with Accounting Standards Codification (ASC) 606, which required it to evaluate "the commercial substance of each arrangement considering the customer's ability and intention to pay as well as the Company's obligation to perform under each contract").

[54] 2021 Form 10-K at 87 (reporting $897.4 million in government revenue and $644.5 million in commercial revenue for 2021, for a total of $1.542 billion); *see also* Defs.' Ex. 70 (Aug. 12, 2021 earnings call transcript) 9, 12; Defs.' App. D (comparing Palantir's SPAC revenue to its total commercial revenue).

12

Palantir's disclosures cautioned investors that the company "may not realize a return on [the SPAC] investments," which could "decline in value or be entirely lost."[55] It noted that the early stage companies in which it invested "may be engaged in businesses that involve novel and unproven technologies, products, and services and . . . may be unable to perform their obligations under any commercial contracts that [Palantir] enter[ed] into with them, in a timely manner or at all."[56] These risks could "negatively impact [Palantir's] expected revenue and collections."[57]

## G. SPAC Underperformance

By early 2022, SPACs were experiencing a market-wide downturn.[58] Palantir's SPAC investment program saw considerable setbacks. Palantir suffered $165.7 million of unrealized losses in its SPAC portfolio—a 42% decline—as of April 2022.[59] The Board abandoned Palantir's SPAC investment strategy.[60]

---

[55] Q1 2021 Form 10-Q at 59; Q2 2021 Form 10-Q at 45, 63.

[56] Q1 2021 Form 10-Q at 59; Q2 2021 Form 10-Q at 63; Defs.' Ex. 70 ("Q3 2021 Form 10-Q") 65; 2021 Form 10-K at 38.

[57] Q1 2021 Form 10-Q at 59; Q2 2021 Form 10-Q at 63, 65; Q3 2021 Form 10-Q at 65; 2021 Form 10-K at 36-38, 95.

[58] *See In re Hennessy Cap. Acq. Corp. IV S'holder Litig.*, 318 A.3d 306, 310 (Del. Ch. 2024) ("As the dust of SPAC mania settled, a sobering picture emerged. Early-stage companies strained to adapt to the demands of being exchange listed and struggled to remain viable amid economic headwinds. . . . Some companies filed for bankruptcy."), *aff'd*, 2024 WL 5114140 (Del. Dec. 16, 2024) (TABLE).

[59] Compl. ¶ 399.

[60] *Id.* ¶ 400 (citing internal documents confirming that Palantir had "no additional commitments to strategic investments").

In May 2022, Palantir publicly announced that it had "wound the [SPAC investment] program down" and would not be accepting "additional new customers from this program."[61]  Despite the SPAC-related losses, Palantir reported that first quarter 2022 revenue had exceeded its guidance.[62]  In November 2023, Palantir disclosed that its SPAC investments were worth $392.1 million—$375.8 million less than the $767.9 million initially projected.[63]

## H.  The Securities Action

In September 2022, Palantir stockholders filed a putative securities class action in the United States District Court for the District of Colorado (the "Securities Action").[64]  The plaintiffs alleged that Palantir and certain directors and officers deliberately misled investors by making false statements about Palantir's growth and engaging in a SPAC "scheme" to facilitate alleged insider trading.[65]

---

[61] *Id.* ¶ 407 (quoting May 9, 2022 earnings call transcript); *see* Defs.' Opening Br. Ex. 77 (May 9, 2022 earnings call transcript) 12.  Palantir did not, however, end relationships with all existing SPAC customers.  *See* Defs.' Opening Br. Ex. 82 (2023 Form 10-K) 100 (recognizing $87.3 million of revenue from strategic commercial contracts in 2023).

[62] Q1 2022 Form 10-Q at 4 (reporting total revenue exceeding $446 million in the first quarter of 2022).

[63] Comp. ¶ 430; *see supra* note 53 and accompanying text (original $767.9 million projection).

[64] *Cupat v. Palantir Techs., Inc.*, No. 22-cv-02384 (D. Colo.); Compl. ¶¶ 14, 417.

[65] Defs.' Ex. 91 (Securities Action complaint); *see* Compl. ¶ 419.

14

On March 31, 2024, the court dismissed the Securities Action without prejudice for pleading deficiencies.[66] An amended complaint was filed a few months later.[67] The Securities Action was recently dismissed with prejudice for failure to state a claim.[68]

## I. This Litigation

Palantir stockholders filed the present action in this court on August 22, 2023.[69] The suit followed Palantir's production of books and records to the plaintiffs pursuant to 8 *Del. C.* § 220.

After the defendants moved to dismiss, the plaintiffs filed a 230-page amended complaint (the operative Complaint) on February 16, 2024.[70] The Complaint advances four counts derivatively on behalf of Palantir.[71]

Count I is a breach of fiduciary duty claim against members of Palantir's Board for "causing the Company to engage in the SPAC scheme" and for issuing false and misleading disclosures to raise Palantir's stock price.[72] Count II is a similar

---

[66] *Cupat v. Palantir Techs., Inc.*, 2024 WL 1374903, at *1, 3 (D. Colo. Mar. 31, 2024).

[67] Second Am. Consol. Class Action Compl., *Cupat v. Palantir Techs., Inc.*, No. 22-cv-02384, 2024 WL 1374903 (D. Colo. May 24, 2024).

[68] Dkt. 73.

[69] Dkt. 1.

[70] Dkts. 12, 25.

[71] Compl. ¶¶ 486-512.

[72] *Id.* ¶¶ 486-94. Count I is brought against the "Director Defendants," as defined in paragraph 56 of the Complaint.

breach of fiduciary claim against certain Palantir officers focused on disclosures.[73]

Count III is a *Brophy* claim for alleged insider trading against insiders who sold

Palantir shares during and after the direct listing.[74] Count IV is a related unjust

enrichment claim.[75]

On April 15, 2024, the defendants moved to dismiss the Complaint.[76] Briefing

on the motion was complete as of July 1.[77] Oral argument was presented on January

15, 2025, after which the motion was taken under advisement.[78]

## II.    ANALYSIS

The individual defendants and Palantir seek dismissal of this suit under Court

of Chancery Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6)

for failure to state a claim. The Rule 23.1 motion is dispositive. The plaintiffs chose

to forgo making a demand on the Board and have not demonstrated demand excusal.

---

[73] *Id.* ¶¶ 495-502. Count II is brought against the "Officer Defendants," as defined in paragraph 56 of the Complaint.

[74] *Id.* ¶¶ 503-07; *see Brophy v. Cities Servs. Co.*, 70 A.2d 5 (Del. Ch. 1949). Count III is brought against the "Insider Seller Defendants," as defined in paragraph 56 of the Complaint.

[75] Compl. ¶¶ 508-12. Count IV is similarly brought against the "Insider Seller Defendants." *See id.* ¶ 56.

[76] Dkt. 42. In the alternative, the defendants requested a stay in deference to the Securities Action. That motion is moot since the Securities Action has been dismissed with prejudice. *See supra* note 68 and accompanying text.

[77] Dkt. 51.

[78] Dkt. 65; Dkt. 67 ("Hr'g Tr.").

In a demand futility analysis, "[t]he court is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice."[79] "Rule 23.1 requires that a plaintiff who asserts demand futility must 'comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).'"[80] The court will draw "all reasonable factual inferences that logically flow from the particularized facts alleged."[81]

## A. The Demand Futility Standard

In *United Food & Commercial Workers Union v. Zuckerberg*, the Delaware Supreme Court adopted a three-part "universal test" for demand futility.[82] The court must consider, director-by-director:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

[79] *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

[80] *In re INFOUSA, Inc. S'holders Litig*, 953 A.2d 963, 985 (Del. Ch. Aug. 13, 2007) (quoting *Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *7 (Del. Ch. Dec. 20, 2002)).

[81] *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

[82] 262 A.3d 1034, 1058 (Del. 2021).

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[83]

Demand is excused as futile if "the answer to any of the questions is 'yes' for at least half of the members of the demand board."[84]

"The court 'counts heads' of the members of a board to determine whether a majority of its members are disinterested and independent for demand futility purposes."[85] When this lawsuit was filed, Palantir's Board had seven members: cofounders Karp (CEO), Thiel (Chairman of the Board), and Cohen (President and Secretary), and outside directors Alexandra Schiff, Alexander Moore, Lauren Friedman Stat, and Eric Woersching.[86] The Complaint calls these seven directors the "Demand Board."[87] Other than Woersching, all Demand Board members are named as defendants.[88]

---

[83] *Id.* at 1059.

[84] *Id.*

[85] *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021) (citation omitted), *aff'd*, 279 A.3d 356 (Del. 2022) (TABLE).

[86] Compl. ¶ 436.

[87] *Id.*

[88] *Id.* Woersching replaced defendant Spencer Rascoff on the Board in June 2022. *See id.* ¶¶ 46, 482.

18

The demand futility analysis is conducted claim by claim. Against members of the Demand Board, the plaintiffs advance (1) a *Brophy* claim, (2) a breach of fiduciary duty claim regarding the SPAC investment program, and (3) an unjust enrichment claim. Their demand futility arguments for these claims largely overlap. The plaintiffs assert that demand is futile because the six defendants on the Demand Board face a substantial likelihood of liability for breach of fiduciary duty and unjust enrichment, the four members of the Demand Board who sold Palantir stock received a material personal benefit, and various directors lack independence from one another. The first argument fails because there are no particularized allegations supporting a reasonable inference that the directors face likely liability for a non-exculpated claim. The second argument fails because the benefit received was not a result of misconduct, as *Zuckerberg* requires. The third argument is therefore irrelevant.

## B. Substantial Likelihood of Liability

Directors are unable to impartially consider a demand if they face a substantial likelihood of personal liability on the claims asserted.[89] "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is

---

[89] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *see Zuckerberg*, 262 A.3d at 1059 (explaining that the *Zuckerberg* "three-part test is consistent with and enhances *Aronson*, *Rales*, and their progeny, . . . [so] cases properly construing *Aronson*, *Rales*, and their progeny remain good law.").

insufficient to challenge either the independence or disinterestedness of directors . . . ."[90] Plaintiffs must "make a threshold showing, through the allegation of particularized facts, that their claims has some merit."[91] The court "must be satisfied that . . . plaintiff[s] ha[ve] alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment."[92]

For the Demand Board members to be compromised, they must face a substantial likelihood of liability on one of two related claims: (1) that they traded Palantir stock based on material, nonpublic information in their possessions; or (2) that they breached their duties of loyalty in connection with Palantir's SPAC investment program. The plaintiffs have not met their burden on either claim. The unjust enrichment claim falls with the others.

### 1. The *Brophy* Claim

A *Brophy* claim is "a state version of a federal insider trading claim and has its origins in Delaware law in the venerable case" by the same name.[93] As a general rule, "[c]orporate officers and directors may purchase and sell the corporation's

---

[90] *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984); *see supra* note 89.

[91] *Rales*, 634 A.2d at 934.

[92] *Aronson*, 473 A.2d at 815.

[93] *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 925 (Del. Ch. 2004) (citing *Brophy*, 70 A.2d 5), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE).

stock at will, without any liability to the corporation."[94]  Delaware law consequently "sets the bar for stating a claim for breach of fiduciary based on insider trading very high."[95]  To succeed on this theory, the plaintiffs must show that "1) the corporate fiduciary possessed material, nonpublic company information [(MNPI)]; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."[96]

The plaintiffs advance a *Brophy* claim against four of the Demand Board's seven members: Karp, Thiel, Cohen, and Moore.[97]  They assert that these directors "sold Palantir stock while in possession of MNPI that artificially inflated" the stock price.[98]  They take issue with stock sales in two time periods.  The first is within days of the direct listing when insiders could "sell up to 20% of their shares

---

[94] *Tuckman v. Aerosonic Corp.*, 1982 WL 17810, at *11 (Del. Ch. May 20, 1982).

[95] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019).

[96] *Oracle*, 867 A.2d at 934.

[97] Compl. ¶ 56.  The claim is also brought against officers Shyam Sankar, David Glazer, and Ryan Taylor, and former Board member Rascoff.  *Id.*

[98] *Id.* ¶ 505; *see also id.* ¶ 15 (alleging that "[t]hrough the [d]irect [l]isting and the SPAC scheme," the defendants "used their access to MNPI to cause the Company to create a market for their Palantir stock [and] . . . facilitate their continued sales of Palantir stock at artificially inflated prices").

immediately."[99]  The second is in the months following the direct listing amid the SPAC investment program.[100]

The plaintiffs have not established that any Demand Board members face a substantial likelihood of liability for trades during either period.  There is no rational inference to be drawn that the directors had MNPI when they traded, much less that they exploited MNPI for a trading advantage.

a.    MNPI

The plaintiffs have not adequately pleaded that any of the directors had MNPI when they sold Palantir shares.  Material nonpublic information is—as the term suggests—undisclosed confidential company data.  The information must be of such "magnitude" that its disclosure would have "actual significance in the deliberations" of a reasonable investor "deciding whether to buy, sell, vote, or tender stock."[101]  No such information is described in the Complaint.  The purported MNPI is either immaterial in view of the complete Board documents relied on or was publicly disclosed.

---

[99] *Id.* ¶ 65 (emphasis removed); *see also supra* note 12 and accompanying text.

[100] Compl. ¶¶ 1, 93, 100.

[101] *Oracle*, 867 A.2d at 934 (citing *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

## i. *Pre-Direct Listing*

The plaintiffs' allegations about MNPI possessed by the directors before the direct listing are particularly thin. They concern the directors' purported knowledge of Palantir's "unsustainable" government segment revenue growth post-COVID and difficulties signing new customers.[102] Specifically, the plaintiffs assert the directors knew "(i) Palantir relied on a small, existing customer base, (ii) Palantir's new customer acquisition timeline was protracted and expensive, and (iii) Palantir's revenue growth was boosted by COVID-related government contracts and thus was exposed to rapid, significant reversals."[103]

Because these facts were disclosed in the Registration Statement, they are not MNPI.[104] The Registration Statement detailed that Palantir had only 125 customers in the first half of 2020 and that "[a] limited number of customers account[ed] for a

---

[102] Compl. ¶¶ 7, 74, 490 (discussing COVID-related contracts); *id.* ¶¶ 71, 75 (describing difficulties signing new customers).

[103] Pls.' Answering Br. in Opp'n to Individual Defs.' and Nominal Def.'s Mot. to Dismiss or Stay Pls.' Verified Am. S'holder Deriv. Compl. ("Pls.' Answering Br.") (Dkt. 49) 23 (citing Compl. ¶¶ 81-82, 88-89).

[104] *See Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003) (dismissing a *Brophy* claim where the plaintiff failed to allege that the "directors possessed information about [the company]'s actual performance that was materially different than existed in the marketplace at the time they traded"); *In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *9-10 (Del. Ch. Jan. 31, 2022) (stating that information "already known to the market" cannot be MNPI), *aff'd*, 285 A.3d 1204 (Del. 2022) (TABLE).

substantial portion of [Palantir's] revenue."[105]  It also stated that Palantir's sales model was costly and time-consuming, involving the "invest[ment of] significant resources working with customers on pilot deployments at no or low cost to them, which may not result in any future revenue."[106]  It further explained that, though the pandemic "provided certain new opportunities for [Palantir's] business," "negative headwinds" were created.[107]  Palantir warned there could be "no assurances that revenue will continue to grow or do so at current rates."[108]

Still, the plaintiffs say the defendants knew before the direct listing "that Palantir was unlikely to continue on the high growth trajectory" it had touted.[109] They base this assertion on a November 9, 2020 EY report to the Audit Committee that observed Palantir's "[r]evenue growth continue[d] to be primarily driven by existing customers with incremental growth related to COVID-19 related developments."[110]  But this report was issued weeks *after* the direct listing.[111] Although the plaintiffs suggest that EY's reference to the "continue[d]" growth

---

[105] Registration Statement 19, 94.

[106] *Id.* at 18-19.

[107] *Id.* at 39.

[108] *Id.* at 18; *see supra* note 21 and accompanying text.

[109] Pls.' Answering Br. 26-27.

[110] *See supra* note 31 and accompanying text.

[111] *See Camping World*, 2022 WL 288152, at *9 (observing that information is not MNPI if it came to light "after the challenged trades were executed").

24

pattern makes it "reasonable to infer" that the defendants learned this information earlier,[112] they offer no particularized facts in support. "[M]ere speculation" cannot satisfy Rule 23.1[113]

### ii.    *Post-Direct Listing*

The plaintiffs next allege that the directors had MNPI after Palantir went public and when they entered into 10b5-1 trading plans. They assert that the defendants "knew": (1) Palantir was not growing its customer base; (2) Palantir had a "gap-to-[revenue]-goal" shortfall; (3) the "SPAC scheme" falsely inflated revenue; and (4) Palantir's long-term guidance was unsustainable.[114] None of these contentions are grounded in particularized facts.

Customer Base. The plaintiffs' allegations related to Palantir's struggles to grow its customer base and reliance on COVID-era government contracts are again based on the November 9, 2022 EY Audit Committee report.[115] Just one of the four Demand Board members accused of insider trading (Moore) is on the Audit

---

[112] Pls.' Answering Br. 27.

[113] *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 285 (Del. Ch. 2003).

[114] Pls.' Answering Br. 29-37.

[115] *See id.* at 29 (citing Compl. ¶¶ 81-82); *see supra* notes 30-32 and accompanying text (discussing the contents of this report). The same information was reiterated by EY in a February 2021 report to the Audit Committee. Pls.' Answering Br. 30 (citing Compl. ¶ 88).

25

Committee.[116]  There is no well-pleaded allegation that the other four directors received the report, and Moore's knowledge cannot be imputed to them.[117]  In any event, Palantir's customer counts, reliance on a small number of customers, and COVID-related risks were disclosed to the market.[118]

Gap-to-Goal.  The plaintiffs say that the defendants "possessed MNPI that [Palantir] was not performing as well as they had conditioned the market to expect."[119]  The alleged MNPI is Palantir's annual "gap-to-goal" figure.  For example, in January 2021, the Board was told that Palantir's "gap-to-goal" for the year was $220 million.[120]

---

[116] *See* Compl. ¶¶ 42, 46, 50 (noting that the Audit Committee members were Moore, Rascoff, and Stat, of which only Moore was both a Demand Board member and accused of improperly selling shares).

[117] *See Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (rejecting the idea that "knowledge on the part of any one board member can be imputed to other board members as a result of their shared board or committee service").

[118] *See supra* notes 105-108 and accompanying text (outlining the disclosure of this information in the Registration Statement); Registration Statement 18, 39-40, 93, *see, e.g.*, 2021 Form 10-K at 17 ("We derive a significant portion of our revenue from existing customers that expand their relationship with us. . . . Our top three customers together accounted for 18% and 25% of our revenue for the years ended December 31, 2021 and 2020, respectively. . . . Certain of our customers, including customers that represent a significant portion of our business, have in the past reduced their spend with us or terminated their agreements with us. . . . If our efforts to expand within our existing customer base are not successful, our business may suffer."); Q3 2021 Form 10-Q at 48-83.

[119] Compl. ¶ 88.

[120] *Id.*; *see supra* note 35 and accompanying text; *see also* Compl. ¶¶ 351, 388, 397, 411.

The plaintiffs describe the 2021 "gap-to-goal" as representing a $220 million revenue "shortfall."[121] This framing is contradicted by the very Board presentation on which plaintiffs rely, which shows that "gap-to-goal" is the difference between the revenue Palantir had secured and the in-year revenue creation needed to hit guidance.[122] The presentation states: "Assuming 15% of total revenue is created in-year and is not visible in January, this gap-to-goal is estimated to be $220 million."[123] It also explains that "80-85% of [Palantir's] revenue [wa]s visible in January," with the rest to be generated during the year.[124] The Complaint omits these portions of the document.[125]

Based on the full presentation, it would be unreasonable to infer that Palantir was experiencing a "staggering" revenue "shortfall."[126] The only fair reading is that

[121] Compl. ¶ 88 ("The 15% gap between Palantir's projected revenue and actual revenue was comprised of a $68.4 million shortfall in actual commercial revenue and a $151.4 million shortfall in actual government revenue.").

[122] Jan. 2021 Board Presentation at '734-RE; *see supra* notes 35-38 and accompanying text.

[123] Jan. 2021 Board Presentation at '734-RE.

[124] *See supra* note 35 and accompanying text; Jan. 2021 Board Presentation at '734-RE.

[125] *See* Compl. ¶ 88.

[126] *Id.* The plaintiffs insist that rejecting their interpretation of the document would involve drawing a "defense-friendly inference[]." Pls.' Answering Br. 31. Not so. "If a plaintiff chooses to refer to a document in its complaint, the Court may consider the entire document, even those portions not specifically referenced in the complaint." *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *13 n.233 (Del. Ch. Dec. 18, 2017) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 4.06[b][2][i] (2016 ed.)). The court is not required to defer to the plaintiffs' facially unsupported interpretation of a document or ignore unquoted portions of it.

$220 million was the estimate needed to reach Palantir's $1.5 billion revenue target since $1.281 billion was "visible" in January.[127]

SPAC Investments. The plaintiffs next aver that the directors possessed MNPI about Palantir's SPAC investments when some of their stock was sold. They claim that the directors knew the SPAC program was a "sham" to shore up Palantir's revenue projections and hide "deteriorating profit margins and declining government-sector revenue."[128] They also allege that the directors understood—but did not disclose—that "Palantir conducted virtually no diligence" before committing over $500 million to SPAC investments.[129]

These arguments are unconvincing for several reasons.[130]

First, the Complaint lacks particularized allegations suggesting that the defendants knew when Palantir's investments were made that the SPACs would later falter. The plaintiffs' contrary views are akin to "fraud by hindsight."[131] Delaware

---

[127] Jan. 2021 Board Presentation at '734 RE. In fact, Palantir exceeded its 2021 goal by generating almost $450 million in new revenue. 2021 Form 10-K at 87.

[128] Compl. ¶¶ 10-11, 100-01; *see also* Pls.' Answering Br. 32-34.

[129] Pls.' Answering Br. 32.

[130] In addition to issues with the plaintiffs' specific arguments, many of the challenged stock sales predate the first SPAC investment in March 2021 (59% of all sales by proceeds, and 100% of those not subject to a 10b5-1 plan or for tax withholding). Defs.' App. A. Even if the directors had MNPI about the SPAC investments—which is not well-pleaded— such knowledge would therefore be irrelevant to a significant portion of the challenged sales.

[131] *See In re Molycorp, Inc. S'holder Deriv. Litig.*, 2015 WL 3454925, *8 & n.67 (Del. Ch. May 27, 2015) (dismissing derivative duty-of-loyalty claim and rejecting reliance on fraud

courts will not infer bad faith from an ill-fated business decision on a notice pleading standard, much less a particularity standard.[132]

Second, the plaintiffs' belief that the Board knew "SPAC investments were not generating substantial revenue [while] Palantir's losses on these dubious investments w[ere] mounting" is unsupported.[133] The Complaint states only that the Board was told actual cash collections from the SPACs were materially less than the revenue projected over the lifespan of the commercial agreements.[134] This information was publicly disclosed. Palantir's quarterly public filings expressly broke out the revenue attributable to SPACs and detailed the sums collected versus projected.[135] Palantir also cautioned that its SPAC investment strategy involved risks in "expected revenue and collections."[136]

---

by hindsight); *Lewis v. Austen*, 1999 WL 378125, at *5 (Del. Ch. June 2, 1999) (dismissing derivative claims and noting that "fraud by hindsight" is "legally insufficient" in the absence of "a contemporaneous fact from which 'guilty knowledge' could be inferred").

[132] *See, e.g.*, *Hennessy*, 2024 WL 2799044, at *1 ("[P]oor performance is not . . . indicative of a breach of fiduciary duty."); *IBEW Loc. Union 481 Defined Contribution Plan & Tr. v. Winborne*, 301 A.3d 596, 621 (Del. Ch. 2003) ("Inferring bad faith because a decision turned out badly would impose liability by hindsight.").

[133] Pls.' Answering Br. 32.

[134] Compl. ¶¶ 362-63, 391-401; *see also* ¶ 394 (noting that "negative results of the[] SPAC investments" were "with[eld]," since this information had not yet been incorporated into Palantir's financial reporting).

[135] Q1 2021 Form 10-Q at 20; Q2 2021 Form 10-Q at 15; Q3 2021 Form 10-Q at 65; 2021 Form 10-K at 120; Defs.' Ex. 76 ("Q1 2022 Form 10-Q") 50.

[136] *See supra* note 57 and accompanying text.

29

Finally, it cannot reasonably be inferred that the specifics of Palantir's diligence before making the SPAC investments was material information. "An omitted fact is material if there is a substantial likelihood that . . . the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[137] The transactions were each small relative to Palantir's cash on hand and revenues.[138] Stockholders were not asked to weigh in on the investments.

Long-Term Guidance. The last category of information concerns the COVID-related slowdowns that purportedly put Palantir's long-term guidance in doubt.[139]

The plaintiffs assert that the directors had MNPI based on an April 2021 Board presentation that explained: "(1) Palantir had lost two government sector customers; (2) there was '[i]nsecurity around what public budgets/spend will look like post COVID'; and (3) 'big pre-COVID spending commitments' were 'wobbling.'"[140] That is a mischaracterization of the document. The slide from which the plaintiffs' allegations are drawn pertains solely to Palantir's international government

---

[137] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).

[138] *See supra* note 47 and accompanying text.

[139] Pls.' Answering Br. 34-37.

[140] *Id.* at 35 (citing Compl. ¶¶ 351-52).

sub-segment—not its entire government segment.[141]   The plaintiffs omit the observed 83% year-over-year growth in the larger U.S. government sub-segment, which the presentation described as "a positive signal."[142]   They also ignore that, according to the presentation, Palantir gained a new customer during the same period that it lost the other two.[143]   Overall, the information cannot fairly be read to suggest that the Board knew Palantir's long-term guidance was infeasible.

The plaintiffs next cite a November 2021 management presentation to the Audit Committee.[144]   Setting aside that just one of the Demand Board members (Moore) is alleged to have received the report, the information is a summary of public analyst reports.[145]   Public information does not become MNPI just because it is summarized in a nonpublic presentation.[146]

---

[141] Apr. 2021 Board Presentation '883-RE.

[142] *Id.* at '882-RE.

[143] Reply Br. in Supp. of Individual Defs.' and Nominal Def.'s Mot. to Dismiss or Stay Pls.' Verified Am. S'holder Deriv. Compl. (Dkt. 51) Ex. 92 (full Apr. 2021 Board Presentation) '896-RE (discussing customer changes).

[144] Pls.' Answering Br. 35-36 (citing Compl. ¶ 375).

[145] *See* Compl. ¶ 81 (describing the presentation as informing the Board about the doubts of "analysis covering Palantir"); Defs.' Ex. 41 at '4961; Defs.' Ex. 47 at '5373.

[146] The plaintiffs argue that because the presentation was labeled "[p]rivileged and confidential," it would be "procedurally improper" to infer that the presentation lacks MNPI.  Pls.' Answering Br. 36.  It is not an inference to conclude that public analyst statements summarized in a document marked "confidential" are not MNPI.  Under Delaware law, labeling a document "privileged and confidential" does not make it so.  *See Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2019 WL 3763953, at *2 (Del. Ch. Aug. 9, 2019) ("[M]erely labeling a communication as 'privileged' does not make it so."); *see also Camping World*, 2022 WL 288152, at *10 (explaining that information

31

b.      Scienter

A plaintiff pursuing a *Brophy* claim must sufficiently plead that a fiduciary's trades were at least partly motivated by the substance of MNPI she possessed.[147] Although a plaintiff is "not required to uncover and plead the 'smoking scienter gun'" or "plead evidence," this element requires "particularized facts that would support a reasonable inference of knowledge."[148]  The plaintiff must allege that "each sale by each individual defendant" was an act of intentional misconduct.[149]

Here, the plaintiffs advance no specific facts about each defendant's purported conduct or knowledge for each trade.[150]  They instead engage in group pleading, ignoring that the defendants entered into 10b5-1 plans and transacted at different

known to the market was not MNPI simply because it was presented to the board).  There are no particularized allegations in the Complaint supporting an inference otherwise.

[147] *In re Fitbit, Inc. S'holder Deriv. Litig.*, 2018 WL 6587159, at *13 (Del. Ch. Dec. 14, 2018); *Guttman*, 823 A.2d at 505.

[148] *Fitbit*, 2018 WL 6587159, at *15.

[149] *Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985) ("In order for there to be a recovery [on a *Brophy* claim], it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.").

[150] *See Tilden v. Cunningham*, 2018 WL 5307706, at *20 (Del. Ch. Oct. 26, 2018) (stating that a plaintiff must "plead facts to support a reasonable inference that 'each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material nonpublic information'" (quoting *Rattner v. Bidzos*, 2003 WL 2228433, at *11 (Del. Ch. Sept. 30, 2003))).

times.[151] This shortcoming is enough to conclude that scienter has not been adequately pleaded.

Beyond that, any inference of scienter that could be drawn from the plaintiffs' generalizations is negated by the timing of the challenged trades. Most of the allegedly suspicious trades (97% by proceeds) were made either pursuant to a 10b5-1 plan, for tax withholding purposes, or within 30 days of the direct listing.[152] The substantial percentages of stock retained by the directors further undercuts plaintiffs' claim.

### i. *Direct Listing Sales*

The plaintiffs contend that Palantir's choice of a direct listing rather than an underwritten IPO is indicative of the defendants' ulterior motives. The direct listing, they claim, was designed to avoid "outside scrutiny" that would have prevented the defendants from selling "at an artificially high price."[153]

This broad critique of direct listings falls short of the particularity standard. There is nothing intrinsically suspect about corporate insiders participating in a

---

[151] *E.g.*, Compl. ¶¶ 70-74, 83, 98, 350-55, 358-60, 366; *see also In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015) (noting that "each director has a right to be considered individually"); *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 n.36 (Del. Ch. 2009) (rejecting a "'group' accusation mode of pleading demand futility").

[152] *See* Compl. ¶ 77; Defs.' App. A.

[153] *See* Compl. ¶¶ 62, 64-65.

direct listing. The offering structure requires existing stockholders to sell shares to create a public market, since no new shares are issued. Market activity and pricing depend on the willingness of current stockholders to sell shares to public buyers.[154]

The fact that sales were made in conjunction with the offering weakens any inference of scienter that could be drawn from the plaintiffs' allegations. "[E]arly investors and promoters routinely sell stock in IPOs" to gain liquidity.[155] In Palantir's case, the direct listing was the first liquidity event for its stockholders after 17 years as a private company.[156] Even "large sales" of stock by insiders "become far less eyebrow raising" where the stock had "previously been subject to restrictions on sales."[157]

---

[154] *See supra* notes 6-8 and accompanying text.

[155] *In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 922 F. Supp. 2d 445, 470 (S.D.N.Y. 2013) (rejecting "generic accusations" about directors selling stock in an IPO), *aff'd*, 797 F.3d 148 (2d Cir. 2015); *see also In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 950 (N.D. Cal. 2010) (observing that directors and officers selling stock in an IPO "is not suspicious or unusual"); *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2025 WL 82206, at *2 (N.D. Cal. Jan. 13, 2025) (holding that allegations about financial motives for a direct listing did not "bolster a strong inference of scienter").

[156] The federal court in the Securities Action similarly observed that the sales in the direct listing were "not suspicious" because the "whole point of the Offering was so that [insiders] could gain access to liquidity after running Palantir as a private company for 17 years." *Cupat v. Palantir Techs., Inc.*, No. 22-cv-02384-GPG-SBP, slip op. at 20 (D. Colo. Apr. 4, 2025).

[157] *Guttman*, 823 A.2d at 504 n.24.

34

ii.       *10b5-1 and Tax-Related Sales*

The majority of stock sales made by Karp, Cohen, Thiel, and Moore were made under 10b5-1 plans or automatically to cover tax withholding obligations.[158] Rule 10b5-1 plans require corporate insiders to specify upfront the amount, price, and date ranges of anticipated trades and to cede the ultimate execution of these trades.[159]  Insiders entering into a 10b5-1 plan must certify when the plan is adopted that they are "not aware of any material nonpublic information about the security or issuer . . . ."[160]  Each of Karp, Cohen, Thiel, and Moore made that representation.[161] The Complaint lacks well-pleaded allegations indicating that these directors had MNPI when they entered into their 10b5-1 plans.

Because 10b5-1 plans give "trading authority to third parties with exclusive discretion to execute trades under certain pre-determined parameters," they generally "offer a safe harbor for corporate insiders to sell stock."[162]  For equity

---

[158] According to the defendants, $1,539,046,671 out of $2,033,454,183 in total proceeds (or 76%) of the four directors' sales fall into these categories.  *See* Defs.' App. A (outlining when trades occurred based upon each individual defendants' Forms 3 and 4 filings with the SEC); *see* Registration Statement 86 ("To fund the personal tax withholding and remittance obligations arising in connection with the [restricted stock units] that will vest and settle on that day, we expect that current and former employees will use a broker or brokers to sell a portion of such shares into the market on the first trading day.").

[159] 17 C.F.R. § 240.10b5-1(c)(1)(i)(B).

[160] *Id.* § 240.1b5-1(c)(1)(ii)(C)(1).

[161] Defs.' Exs. 6-7, 9, 12 (10b5-1 plans for Karp, Moore, Thiel, and Cohen, respectively).

[162] *Laborers' Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, 2016 WL 3407708, at *2 (Del. Ch. Jun. 14, 2016); *see also Tilden*, 2018 WL 5307706, at *7 n.79.

35

awards, the company's sale of stock to cover tax obligations are similarly routine, automatic, and not within the grantee's control.[163] These facts may "weigh against a finding that insider trading occurred."[164]

Of course, the "mere existence" of a trading plan and "fact that its mechanics literally may have been adhered to do not, in and of themselves, preclude insider trading."[165] The insider subject to a plan could, for example, "tip[] off the broker handling the [t]rading [p]lan."[166] But the Complaint provides no well-pleaded basis from which it could be reasonably inferred that such wrongful action occurred here.

---

[163] Companies commonly sell stocks to satisfy the income and payroll taxes associated with an award of stock, with no input from the grantee on whose behalf such shares are sold. *See* Fidelity, *Tax Withholding in Company Stock Plans: Net Shares, Sell to Cover, Cash*.

[164] *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *13 (Del. Ch. Apr. 30, 2015); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) ("[I]t is well established that trades under 10b-5-1 plan[s] do not raise a strong inference of scienter." (internal citation omitted)); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) (explaining that because sales were made as "part of a periodic divestment plan" under Rule 10b5-1, the "timing and amount of the sales do not raise a strong inference of scienter"); *cf. Pfeiffer v. Toll*, 989 A.2d 683, 699 (Del. Ch. 2010) (explaining why Delaware's *Brophy* doctrine is "consistent with—and supportive of—the federal securities regime").

[165] *Lululemon*, 2015 WL 1957196, at *13; *see also Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *17 (S.D.N.Y. Sept. 17, 2019) (noting that a 10b5-1 plan entered into during the class period was "not a cognizable defense to scienter allegations on a motion to dismiss" (citation omitted)).

[166] *Lululemon*, 2015 WL 1957196, at *13.

36

### iii. *Stock Retained*

The plaintiffs lay significant emphasis on the massive profits Karp, Cohen, Thiel, and Moore made from selling their Palantir stock.[167] Delaware courts have held, however, that "the sheer size of [selling defendants'] sales are not sufficient to support a reasonable inference of scienter" where most of their shares were retained.[168] Karp and Cohen each kept 81% of their Palantir shares.[169] Moore kept 70%.[170] And the plaintiffs do not allege that Thiel sold most of his stake.[171]

### 2. The Fiduciary Duty Claim

The plaintiffs bring an additional breach of fiduciary duty claim against six of the seven Demand Board members regarding Palantir's SPAC investment

---

[167] *See* Pls.' Answering Br. 40; *see also infra* Section II.C**.**

[168] *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at \*25-26 (Del. Ch. Sept. 30, 2020); *see also Guttman*, 823 A.2d at 504 (expressing a lack of receptiveness to plaintiffs' claims against directors who sold 32%, 20%, and 10% of their stakes); *Oracle*, 867 A.2d at 954 (noting that large stock sales by insiders did not support an inference of scienter because they amounted to a small percentage of overall holdings); *accord In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y.1999) ("Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened." (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995))).

[169] Defs.' App. B.

[170] *Id.*

[171] The defendants' counsel represented at oral argument that Thiel retained a sizeable amount of Palantir shares, but the precise percentage could not be computed since Thiel invested in Palantir partly through various entities. Hr'g Tr. 21.

program.[172] It has two components: (1) "issuing [o]ffering [m]aterials and other public filings and statements containing materially misleading information" about the SPAC investments;[173] and (2) approving the SPAC investments in bad faith.[174] That is, the plaintiffs allege that both making disclosures about and approving the investments are disloyal acts.

The claim is intertwined with the plaintiffs' *Brophy* theory. According to the Complaint, the defendants concocted and misrepresented the "SPAC scheme" to "prop[] up the Company's revenue growth and projected growth" so that insiders could "unload shares on the unsuspecting public" while they possessed MNPI.[175] This theory rests on conjecture and hindsight bias rather than particularized facts.[176] None of the plaintiffs' allegations show that any of the Demand Board members face a substantial likelihood of liability for a non-exculpated claim.[177]

Palantir took a risk by investing in SPACs. As the Complaint acknowledges, though, it did some diligence, was advised by outside counsel, and publicly disclosed each of the investments. There are no particularized facts fairly suggesting that the

---

[172] *See supra* note 88 and accompanying text (explaining that all the Demand Board members except Woersching are named as defendants); Compl. ¶¶ 487-94.

[173] Compl. ¶ 492.

[174] *Id.* ¶ 489.

[175] *Id.* ¶ 492.

[176] *See supra* note 131 and accompanying text.

[177] *See* Defs.' Ex. 60 (Palantir certificate of incorporation) Art. VII (exculpation provision).

Board knew in real time that the investments would underperform, much less that it set out to mislead the market. Consequently, the plaintiffs' disclosure and approval arguments are unsuccessful.

### a. Disclosures

Under Rule 23.1's "stringent standard of factual particularity," plaintiffs must allege "which disclosures were misleading, when the Company was obligated to make disclosures, what specifically the Company was obligated to disclose," and "how the Company failed to do so."[178] They must plead specific facts showing "board involvement in the preparation of the disclosures" and "that the violation was made knowingly or in bad faith."[179] The Complaint does not meet these requirements.

To begin, the plaintiffs' brief neglected to address the defendants' arguments about the alleged disclosure violations, thereby waiving that aspect of their claim.[180] Second, apart from Karp,[181] the Complaint lacks particularized allegations that any

---

[178] *Citigroup*, 964 A.2d at 133.

[179] *Id.* at 134.

[180] *See Louden v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 n.3 (Del. 1997) (concluding that a plaintiff waived the review of claims it chose not to brief); *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1990) ("Issues not briefed are deemed waived.").

[181] The plaintiffs aver that a press release was "disseminated in connection with a Form 8-K executed by Karp." Compl ¶ 83. But Delaware courts have held that signatures on public filings are insufficient to support a substantial likelihood of liability for alleged misrepresentations. *See Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

other director prepared, drafted, or made the challenged disclosures.[182]  It instead group pleads that the Board issued misleading statements.[183]  Finally, many of the challenged statements are not linked to the Board but were made by Palantir executives during earnings calls.[184]

### b.    Approval

The approval-related aspect of this claim fares no better.  To succeed, it must overcome two key impediments.  One obstacle is that capital allocation decisions generally fall within a board's business judgment.[185]  The other is that only two of the seven directors on the Board when the SPAC investments were made (Thiel and

---

[182] *See Citigroup*, 964 A.2d at 133 n.91, 134 (holding that a plaintiff failed to establish a substantial likelihood of liability for a disclosure violation where the plaintiff did "not allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions"); *see also Zimmer Biomet*, 2021 WL 3779155, at *15 ("The lack of well-pleaded allegations about the [d]irector [d]efendants' involvement in the disclosures 'independently preclude[s] a finding of demand futility.'" (quoting *Ellis v. Gonzales*, 2018 WL 3360816, at *9 (Del. Ch. July 10, 2018))).

[183] *See* Compl. ¶ 492; *see also supra* note 175 and accompanying text.

[184] Defs.' App. C; *see Ellis*, 2018 WL 3360816, at *9 (rejecting liability for director defendants where the purported misstatements were made by the CEO and the plaintiff failed to allege that the director defendants personally played a role in "approv[ing]" or "prepar[ing]" the statements); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *11 (Del. Ch. Jan. 11, 2010) (explaining that absent "particularized facts to connect the board" to disclosures, "there is reason to doubt that the board knew that the statements were false or misleading or acted in bad faith by not adequately informing themselves about the statements").

[185] *Geller v. Tabas*, 462 A.2d 1078, 1082 (Del. 1983) (explaining that directors are "protected in their investment decisions by the presumption of propriety afforded them by the business judgment rule").

40

Rascoff)—one of whom (Thiel) is on the Demand Board—have alleged conflicts.[186]

These purported conflicts involve just four of the 27 SPAC transactions.[187]  The

Complaint lacks particularized facts suggesting that Thiel or Rascoff materially

benefited from Palantir's investments in these SPACs.[188]

To compensate for these deficiencies, the plaintiffs assert that a majority of

the Demand Board—Karp, Cohen, Thiel, Moore, and Schiff—face a substantial

likelihood of liability for approving the SPAC investments in bad faith.[189]  They

allege that Thiel and Karp "delegated unfettered power" to a special committee "to

approve *any* SPAC deal and *any* attendant licensing agreement."[190]  Cohen, Moore,

and Schiff, as members of that committee, allegedly "approved the disastrous SPAC

deals, often without even conducting bare minimum due diligence and often without

even holding a [committee] meeting to discuss the proposed deals."[191]

---

[186] *See* Compl. ¶¶ 136-37, 283-84, 318, 338, 343; *see also Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) ("If a plaintiff alleging a duty of loyalty breach is unable to plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence, the entire fairness standard of review is not applied and the Court respects the business judgment of the board.").

[187] *See* Compl. ¶¶ 136-37, 283-84, 318-19, 338, 343; *see also id.* ¶ 348 (listing the 27 SPAC investments).

[188] *See In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 364 (Del. Ch. 2008) ("[T]he mere fact that a director received some benefit that was not shared generally by all shareholders is insufficient; the benefit must be material.").

[189] *See* Pls.' Answering Br. 40-41.

[190] Compl. ¶¶ 445-46 (Thiel), 458-59 (Karp); *see also id.* ¶ 152 (describing the formation of the special committee).

[191] *Id.* ¶¶ 452-53 (Cohen), 465-66 (Moore), 468 (Schiff).

The plaintiffs cite an array of facts in an attempt to bolster these assertions, including:

- The timing of the first SPAC investment coming "mere weeks after the [Board] learned revenues were declining and Palantir had nonetheless affirmed lofty 2021 guidance";[192]

- The size of the total investments ($500 million) without "retaining any advisors" to diligence the SPACs or "open[ing] a data room";[193]

- The limited information—primarily "sales pitch presentation[s] prepared by each SPAC's management"—received by the Board before the investments were made;[194]

- The absence of discussions reflected in minutes about the SPACs' prospects, execution of written consents approving 16 of the 27 investments "following no deliberation at all," and approval of ten other investments during "telephonic meetings";[195] and

- The entry into a multi-year licensing agreement with each SPAC concurrent with Palantir's investment at a time when EY had "expressed concerns about changes to the 'Company's customer credit profile' . . . ."[196]

---

[192] Pls.' Answering Br. 44 (citing Compl. ¶¶ 88-89, 94 n.48, 103, 113, 348).

[193] *Id.* (citing Compl. ¶¶ 105, 119, 126-27, 135, 143, 159-61, 169-70, 183-84, 188-89, 201-02, 214-15, 220-21, 225-26, 241-42, 247-48, 250, 256-57, 268-69, 276, 280, 288, 295-96, 305, 311, 314, 322, 335, 342).

[194] *Id.* at 45 (citing Compl. ¶¶ 141 n.93, 143, 255-56, 258 n.202, 283, 288, 294-95, 302, 305, 311-12, 320, 322, 339-42).

[195] *Id.* at 45-46 (citing Compl. ¶¶ 10, 98, 103-348, 386).

[196] *Id.* at 47 (citing Compl. ¶¶ 103, 105, 113, 119, 127, 137, 143-44, 158, 160, 168, 170, 182, 184, 187, 189, 200, 202, 213, 215, 217, 221, 223, 226, 238, 242, 245, 250, 252, 257, 264, 269, 272, 278, 280, 285, 288-89, 293, 295-96, 301, 304-06, 309, 311, 319, 322, 332, 335, 338, 364).

The plaintiffs argue that these facts give reason to doubt that the "directors honestly and in good faith believed" their actions were "in the best interests of [Palantir]."[197] But none support a reasonable inference that the SPAC investments were made in bad faith.

On timing, as discussed above, the suggestion that Palantir's revenue was declining rests on a misconstrual of the underlying Board records.[198]

On the Board's diligence, the allegations—taken as true—suggest negligence at best. The Complaint cites Board presentations that show some diligence into the SPAC investments and discussions of risks and benefits with Palantir management and outside counsel.[199] The Board committee formed for this purpose also rejected two proposed investments after exploring them.[200] To the extent more diligence might have lowered the risk of underperformance—a speculative counterfactual—

---

[197] *Id.* at 40 (quoting *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 268 (Del. Ch. 2003)).

[198] *See supra* notes 141-142 and accompanying text.

[199] *See, e.g.*, Compl. ¶¶ 104, 114-15, 125, 134, 283, 294, 302-03, 334; Defs' Ex. 16; Defs.' Ex. 15; Defs.' Ex. 21. Additional meeting minutes and memoranda produced in response to the plaintiffs' Section 220 demand further demonstrate diligence. *E.g.*, Defs.' Ex. 3 at '923 (minutes for a Board meeting describing the discussion and approval of a SPAC investment); Defs.' Ex. 28 at '3723 (minutes for a special committee meeting describing the discussion and approval of SPAC investments); Defs.' Ex. 31 at '4043 (same); Defs.' Ex. 32 at '4110 (describing diligence on a particular SPAC); Defs.' Ex. 34 at '4387 (same); Defs.' Ex. 35 at '4388 (minutes for a special committee meeting describing the discussion and approval of SPAC investments); Defs.' Ex. 36 at '4489 (describing diligence on a particular SPAC); Defs.' Ex. 39 at '4587 (same).

[200] Defs.' Opening Br. Exs. 38, 48.

there remains "a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[201]

The plaintiffs insist that, viewed together, the various flaws in the Board's process become substantial enough to support an inference of bad faith. They analogize their approach to a "mulligan stew" of facts that the court must "sample."[202] If the "pleading-stage flavor is foul," they say, the motion to dismiss must be denied.[203]

To be sure, this court must view well-pleaded facts holistically in assessing demand futility.[204] But the adequacy of a complaint is not measured by the quantity of allegations; the assembled facts must qualitatively meet the plaintiffs' pleading burden. Here, the plaintiffs must make particularized allegations supporting a

---

[201] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009); *see also Wayne Cnty. Emps.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *14 (Del. Ch. July 24, 2009) ("Bad faith cannot be shown by merely showing that the directors failed to do all they should have done under the circumstances."); *McElrath v. Kalanick*, 224 A.3d 982, 993 (Del. 2020) (rejecting allegations of bad faith where the board "heard a presentation that summarized the transaction, reviewed the risk of litigation . . . , generally discussed due diligence, asked questions, and participated in a discussion").

[202] Pls.' Answering Br. 41 (quoting *Winborne*, 301 A.3d at 623); *see also id.* at 47 (arguing that the defendants are "[u]nable to eliminate the 'foul' 'pleading-stage flavor' of th[eir] 'concoction'" (citation omitted)); *see also infra* note 206 (defining a "mulligan stew").

[203] Pls.' Answering Br. 41 (quoting *Winborne*, 301 A.3d at 623).

[204] *Id.*; *see also Winborne*, 301 A.3d at 623 ("At the pleading stage, the test is whether the complaint alleges a constellation of particularized facts which, when viewed holistically, support a reasonably conceivable inference that an improper purpose sufficiently infected a director's decision to such a degree that the director could be found to have acted in bad faith.").

44

reasonable inference that the defendants "acted with scienter, meaning that 'they had actual or constructive knowledge that their conduct was legally improper.'"[205] Mixing together "odds and ends"[206] of minor critiques is not a recipe for bad faith, even with a hearty serving of plaintiff-friendly inferences.

\* \* \*

The plaintiffs' narrative of misconduct is multi-faceted. It begins with an ambitious plan to leverage Palantir's direct listing for insider trades. It then pivots to a SPAC investment scheme meant to distract from slowing revenue and enable additional stock sales.

The story breaks apart in context. The trades, though large, took place in circumstances that are typically proper: in connection with a public offering, under 10b5-1 plans, or to cover tax withholding. Though insider trading could still occur in those cases, the Complaint lacks well-pleaded facts supporting a reasonable inference that the sales were made on the basis of MNPI.

The plaintiffs' claims are not strengthened by their allegations about Palantir's SPAC investments. Disinterested business decisions that are imprudent in hindsight

---

[205] *McElrath*, 224 A.3d at 991 (citing *City of Birmingham Ret. and Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017)).

[206] "Mulligan Stew," Wikipedia, https://en.wikipedia.org/wiki/Mulligan_stew (explaining that "mulligan stew" refers to "hobo stew" that was prepared in camps in the early 1900s and was "broadly defined as a stew made of odds and ends or any available ingredients") (last visited Apr. 12, 2025).

are not indicative of bad faith. The SPAC program was also disclosed, and the purported misstatements about it are not attributed to the Board.

Accordingly, the plaintiffs have not established that a majority of the Demand Board members face a substantial likelihood of liability on a non-exculpated *Brophy* or breach of fiduciary duty claim. The unjust enrichment claim falls alongside the others.[207] The second prong of *Zuckerberg* is unmet.

### C. Material Personal Benefit

The plaintiffs also assert that demand is futile because Thiel, Karp, Cohen, and Moore received material personal benefits from the challenged trades.[208] They insist that the scale of the directors' trade proceeds alone impugns their impartiality, making demand futile. This argument invokes the first prong of *Zuckerberg*.

Thiel, Karp, Cohen, and Moore collectively made billions of dollars selling their Palantir stock.[209] In the three days after the direct listing, for example, Karp made over $135 million, Cohen made over $37 million, Thiel made over $278

---

[207] *Clovis*, 2019 WL 4850188, at *17 n.236 (explaining that a "claim for unjust enrichment rises or falls with [a] *Brophy* claim"); *Calma v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015) ("At the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—i.e., where both claims are premised on the same purported breach of fiduciary duty—is frequently treated 'in the same manner when resolving a motion to dismiss.'" (citation omitted)).

[208] Compl. ¶ 437.

[209] *Id.* ¶ 12.

million, and Moore made over $3.5 million by selling Palantir shares.[210]  The Court of Chancery has remarked, in the merger context, that much smaller sums are sufficient to infer materiality at the pleading stage.[211]

Yet the demand futility test does not view materiality in a vacuum. *Zuckerberg* directs this court to consider whether a material personal benefit was obtained "from the alleged *misconduct*."[212]  Intentionally exploiting MNPI to gain a trading advantage is misconduct; selling company stock at a profit is not.[213]  Absent "special circumstances," Delaware law permits officers and directors to freely trade their corporations' stock.[214]  The bar to *Brophy* liability is set high in recognition of the benefits gained by "aligning [fiduciaries'] interests with the company through

---

[210] *Id.* ¶¶ 439-40, 449-50, 456, 463-64.

[211] *See, e.g.*, *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 813 (Del. Ch. 2022) (concluding that a "greater than half-million-dollar payout [wa]s presumptively material at the motion to dismiss stage"); *Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012) (explaining that a $250,000 fee was sufficient to "reasonably infer that [a party] was interested in [a] [m]erger").

[212] *Zuckerberg*, 262 A.3d at 1059 (emphasis added).

[213] *See Rosenberg v. Oolie*, 1989 WL 122084, at *3-4 (Del. Ch. Oct. 16, 1989) (discussing *Brophy*'s requirement that "some causal link must be established between the confidential information the corporate insiders possess and any profits they accumulate" and that, without this link, an insider is "free to trade in the market place [sic] in his company's stock").

[214] *Brophy*, 79 A.2d at 8 (explaining that trading in company stock is only inappropriate where the person trading is "a person in a confidential or fiduciary position," and "in breach of his duty, uses his knowledge to make a profit for himself"); *see also Tuckman*, 1982 WL 17810, at *11 ("[C]orporate officers and directors may purchase and sell the corporation's stock at will, without any liability to the corporation.").

stock ownership, a dynamic facilitated by the fact that many directors and officers are compensated in stock."[215]

In *Guttman v. Huang*, Chief Justice (then-Vice Chancellor) Strine likewise observed the perils of declaring directors who sold stock conflicted without first considering the allegations of misconduct.[216] There, as here, the director defendants sold stock to marketplace buyers.[217] The court observed that "such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table."[218] Further, the court expressed that it would be "unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information."[219]

The court outlined a more "balanced approach" to the demand futility analysis tailored to the unique features of a *Brophy* claim. It turns on "whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because [the directors] engaged in material trading

---

[215] *Clovis*, 2019 WL 4850188, at *15.

[216] 823 A.2d 492, 502 (Del. Ch. 2003).

[217] *Guttman*, 823 A.2d at 502.

[218] *Id.*

[219] *Id.*

48

activity at a time when . . . they knew material, non-public information about the company's financial condition."[220] This more nuanced assessment avoids the sort of "hair-trigger demand excusal that *Aronson* and *Rales* eschewed."[221]

More recently, in *Grabski v. Andreessen*, the Court of Chancery recognized the importance of a context-specific approach to demand futility for insider trading claims.[222] Citing *Guttman*, the court noted that "[j]ust as it would be 'unwise' to say that a director *always* materially benefits under *Zuckerberg* when she sells company stock, it would be unwise to say a director *never* materially benefits under *Zuckerberg* even if she receives a gargantuan financial benefit."[223] There, the challenged sales were made when the defendants allegedly knew about an internal valuation of the company's common stock "well below its trading price when they sold into the [d]irect [l]isting."[224] The court held that the "billions of dollars made by" directors who traded were "material personal benefit[s] that would render [them] incapable of impartially considering a demand attacking those sales."[225]

---

[220] *Id.*

[221] *Id.*; *see supra* note 89 (explaining that *Aronson* and *Rales* remain "good law").

[222] 2024 WL 390890 (Del. Ch. Feb. 1, 2024).

[223] *Id.* at *9.

[224] *Id.*

[225] *Id.*

In this case, the plaintiffs have not adequately pleaded that the directors received a material benefit from wrongdoing. The Complaint fails to show that any Demand Board member faces a substantial likelihood of personal liability for insider trading. Certain directors sold stock in a direct listing, which is designed for that purpose, and under 10b5-1 plans, which removed their trading discretion. Neither MNPI nor purposeful trading on the substance of MNPI is well-pleaded. On these facts, it would be inequitable to consider demand futile simply because the directors made large profits selling their stock to the public.

*Zuckerberg* did not transform the demand futility analysis into a rigid checklist. The test remains a contextual one that allows the court to consider multiple, interrelated factors. For *Brophy* claims, the second prong of the *Zuckerberg* test logically informs the first. Myopically focusing on the profits a board made selling stock, without regard to the circumstances, would lower the bar to *Brophy* liability and upset the "incentive[s] that holding company stock provides directors."[226]

---

[226] *Zimmerman v. Braddock*, 2005 WL 2266566, at *7 (Del. Ch. Sept. 8, 2005) ("Not permitting directors adequate opportunities . . . to liquidate their holdings (or placing potential insider trading liability upon them without sufficient allegations of fault) destroys the very incentive that holding company stock provides directors."), *rev'd on other grounds*, 906 A.2d 776 (Del. 2006); *see also Clovis*, 2019 WL 4850188, at *15; *Guttman*, 823 A.2d at 502.

## D. Independence

The plaintiffs also assert that Karp, Theil, Cohen, Moore, Schiff, and Woersching "lack independence from other Demand Board members who either face a substantial likelihood of liability or who received a material personal benefit."[227]  This argument invokes the third *Zuckerberg* prong.  Because the plaintiffs have not adequately pleaded that any Demand Board member either faces a substantial likelihood of liability or received a material personal benefit from wrongdoing, that prong does not apply.

## III. CONCLUSION

The plaintiffs have failed to plead particularized facts demonstrating that demand is futile as to a majority of the Demand Board members.  The defendants' motion to dismiss is therefore granted.  The Complaint is dismissed in its entirety under Rule 23.1.

---

[227] Compl. ¶ 469.